Robert M. DESMOND, Plaintiff,

v.

FEDERAL DEPOSIT INSURANCE
CORPORATION, Defendant.

Civ. A. No. 90–12287–WD.

United States District Court,
D. Massachusetts.

June 25, 1992.

## MEMORANDUM AND ORDER

WOODLOCK, District Judge.

The facts of this case press against the limits of federal common law and statutory protections afforded the Federal Deposit Insurance Corporation (FDIC) when it takes over failed banking institutions. As banks continue to fail in troubled economic times, the FDIC, invoking protections carved out by the courts and Congress, has adopted an aggressive stance in meeting the claims and defenses asserted by borrowers from the failed institutions the FDIC is required to supervise. In this case, it is necessary to address the nature and extent of any protections shielding the FDIC when borrower allegations of duress are at issue.

The case arises out of a series of loan transactions entered into by Robert Desmond and the Eliot Savings Bank ("Eliot"). Desmond appeared to be defaulting on a series of bank loans and began negotiating a restructuring of those loans in late 1988. Desmond alleges that Eliot, citing a potential conflict of interest, maliciously forced Desmond's attorney to withdraw at a crucial time during the negotiations and then coerced Desmond into signing an oppressive forbearance agreement. Desmond sued, and the FDIC, which took over for the failing Eliot, counterclaimed on the loans. The FDIC has moved for summary judgment on the Complaint and on its Counterclaims. Because there remain factual issues relevant to certain of the claims and counterclaims, I will grant the FDIC's motion only in part.

## I. FACTUAL BACKGROUND

In assessing the defendants' motion for summary judgment, I must view the record in the light most favorable to the nonmoving party and indulge all inferences favorable to that party. *Villanueva v. Wellesley College*, 930 F.2d 124, 127 (1st Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 181, 116 L.Ed.2d 143 (1991). The motion should

be granted only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). I here summarize the factual record as reflected in the submissions of the parties and highlight those areas where the parties are in significant dispute.

Robert Desmond, as general partner of a limited partnership known as Round Hill Associates, was the developer of a residential subdivision known as Round Hill. In order to finance the construction of the Round Hill project, on November 5, 1986, Round Hill Associates entered into a construction loan agreement with Eliot, whereby Eliot agreed to loan Round Hill $9,400,-000. Pursuant to the agreement, Round Hill executed and delivered a promissory note reflecting the loan ("the Round Hill note"), and Desmond secured the note with a written personal guaranty ("the Desmond Guaranty"). Affidavit of Robert M. Desmond at ¶¶ 2–3.[1] The Round Hill note was payable at a variable rate of interest and was to mature on May 1, 1988. *See* Round Hill note, Exhibit C, Affidavit of David Linderman.

On October 21, 1987, Desmond executed and delivered to Eliot two promissory notes in the aggregate amount of $3,000,000 ("the first and second Desmond notes"), and on March 14, 1988, he executed an additional note in the principal amount of $300,000 ("the third Desmond note"). Desmond Affidavit at ¶ 4. All three notes were to mature on October 21, 1988 and were also payable at variable interest rates. *See* Exhibits E, F, and G, Linderman Affidavit.

According to Desmond, Eliot and Desmond, through his attorney Philip Notopoulos, began negotiating a restructuring of the various loans sometime during 1988. Desmond Affidavit at ¶ 5. Desmond alleges that Eliot knew of Notopoulos's intimate familiarity with the plaintiff's affairs and never objected to the attorney's representation. Then, during December of 1988, when the restructuring was near completion, Notopoulos explained that his law firm represented Eliot on unrelated matters and that Eliot demanded that he withdraw from representing Desmond. *Id.* at ¶ 8.[2]

Desmond then called Eliot's executive vice-president Elise Caffrey, who explained that the bank "had just decided that it could no longer abide the perceived conflict of interest." Desmond Affidavit at ¶ 10. Desmond responded that he would need time to obtain substitute counsel, but Caffrey allegedly answered that there was no time and that the matter of the loans demanded immediate resolution because the "clock was running down." *Id.* at ¶ 11. On December 28, 1988, Desmond met with Caffrey, who presented him with a forbearance agreement and a security agreement modifying the earlier loans and demanded that he immediately execute the documents or Eliot would proceed against Desmond and Round Hill. The plaintiff asserts that he had no time to review the documents and would not have signed them had he had a viable alternative or at least the benefit of counsel. Desmond states further that the forbearance agreement adversely affected his legal rights, granted "nearly everything [he] owned as collateral to Eliot," and contained many oppressive terms. *Id.* at ¶¶ 12–13. The bank allegedly pursued this course of conduct, including the forced withdrawal of Notopoulos, in bad faith and in order to coerce Desmond

---

**1.** Desmond's Affidavit is the subject of the FDIC's Motion to Strike. While the affidavit is admittedly based in part on "information and belief," *see* ¶ 1, I consider for the purposes of this motion only those assertions that facially derive from Mr. Desmond's personal knowledge, including his recollections of what Eliot's officers explicitly said to him.

**2.** In the Motion to Strike Affidavit, the FDIC characterizes this recollection of what Notopoulos said that Eliot told him as "totem pole hearsay." Whatever the merits of this claim, it is superseded by Desmond's personal assertions about what Eliot later said to Desmond directly about the conflict of interest. *See* the next paragraph of this opinion and Desmond Affidavit at ¶¶ 9–10.

into executing an unreasonable agreement under conditions of duress. Complaint at ¶¶ 16–18.

The defendant characterizes the forbearance agreement differently. According to the FDIC, by October of 1988, Desmond and Round Hill had defaulted on their obligations under the Round Hill note, the Desmond guaranty, and the three Desmond notes (collectively, "the initial loan documents"). Answer and Counterclaim at ¶ 7. The FDIC does not deny that Eliot may have forced Notopoulos's withdrawal in bad faith and for the purposes of unfair advantage, but merely states that it is without information sufficient to form a belief as to the truth of those allegations. *See* Answer and Counterclaim at ¶¶ 12–18. The FDIC does state, however, that in the forbearance agreement, the plaintiffs acknowledged that the initial loan documents were unconditionally due in full and subject to no defense or claim of any kind. Eliot, moreover, agreed to forbear from exercising its rights under those documents until September 30, 1989, with respect to the Desmond notes, and until June 30, 1990, with respect to the Round Hill note and Desmond Guaranty, if the plaintiffs met all their obligations under the new agreement, including payment in full within the forbearance periods. Desmond additionally executed a *fourth* promissory note for $400,000 with a maturity date of September 30, 1989. *See* Memorandum of Reasons Why Motion for Summary Judgment on Counterclaim Should be Granted at 3.

By April of 1989, Desmond and Round Hill were in default of their respective obligations under the loan documents as modified by the forbearance agreement. On April 12, Eliot sent Desmond and Round Hill notice of their defaults and a demand for payment. The plaintiffs did not respond to the notice and demand for payment in full within seven days, as the notice required. *See* Counterclaim at ¶¶ 12–14.

Part of the additional collateral Desmond granted to Eliot in the December 28, 1988 forbearance and security agreements was certain property located at Strawberry Hill Farm, where Desmond's 87–year–old mother lived. On November 21, 1989, Eliot allegedly promised that it would take no action at Strawberry Hill Farm as long as the parties were attempting in earnest to resolve their disputes. Despite this promise, Eliot repossessed certain furniture, paintings, rugs, and light fixtures from the property. Complaint at ¶¶ 25–27. Desmond adds that Eliot was maliciously trying to gain unfair leverage over him, and that an Eliot representative told his mother, "if you have a problem, lady, just remember that your son did this to you." Desmond Affidavit at ¶ 16.

On May 8, 1990, Eliot officer Fred Maloof allegedly offered to accept in full and complete settlement of all the plaintiffs' loans either $4,000,000 by July 31, 1990, or $3,500,000 cash plus a $1,000,000 promissory note. Desmond agreed to the settlement and advised Eliot that he would pay the bank $4,000,000 by July 31. Desmond made arrangements to follow through on the settlement and was ready to pay, but the Bank repudiated the offer and demanded $4,500,000 instead.

On June 29, 1990, the Commissioner of Banks, determining Eliot to be in unsafe condition, appointed the FDIC liquidating agent of the Bank. The Supreme Judicial Court confirmed the appointment. The FDIC thus succeeded to all the rights, titles, powers, and privileges of Eliot. The FDIC, as liquidating agent, in turn assigned to the FDIC in its corporate capacity certain of Eliot's assets, including the loans at issue in this case, and retained certain of Eliot's liabilities, including the claims asserted by Desmond and Round Hill in the Complaint. Linderman Affidavit at ¶¶ 2–4.

On June 14, 1990, just prior to the appointment of the FDIC, Desmond instituted suit in Massachusetts Superior Court. The ten counts assert claims for: intentional tort; breach of the oral settlement agreement; intentional or negligent misrepresentation with respect to (a) failing to advise Desmond of his attorney's conflict of interest and Eliot's intention to seek the attorney's withdrawal, (b) promising a $4,000,-

000 settlement, and (c) promising not to take action at Strawberry Hill Farm pending negotiations; breach of the covenant of good faith and fair dealing; tortious interference with business relations; negligence; breach of duty and failure to act in a commercially reasonable manner; unfair or deceptive acts in violation of Mass. Gen.L. ch. 93A, §§ 2 and 11; a declaratory judgment that the forbearance agreement is void and Desmond is free from obligation to Eliot; and promissory/equitable estoppel with respect to the oral settlement agreement.

On September 9, 1990, the action was removed properly to federal court pursuant to 12 U.S.C. § 1819(b)(2). The FDIC was subsequently substituted as the party defendant to this suit, answered the Complaint and asserted Counterclaims in four counts for judgment against the plaintiffs on the initial loan documents as modified by the forbearance agreement, on the fourth Desmond note, and on a common count for money lent. Desmond and Round Hill answered the Counterclaims and asserted defenses of estoppel and Eliot's inequitable conduct, breach of contract, misrepresentation, and bad faith as bars to the Counterclaims. The defendant FDIC now moves for summary judgment both on the Complaint and its Counterclaims.

## II. THE FEDERAL ESTOPPEL DOCTRINE

The principal thrust of the FDIC's motion is that Desmond's claims and defenses are barred by the doctrine of federal estoppel announced in *D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp.*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942) and codified by 12 U.S.C. § 1823(e). Because the estoppel doctrine lies at the core of this lawsuit, it warrants close examination. In *D'Oench*, a borrower defaulted on bonds he had previously sold to a bank. In an apparent effort to inflate its assets prior to a bank examination, the bank then accepted a promissory note from the borrower with the understanding that the bank would never try to collect on the note. That understanding was indicated on the receipts for the notes, but was not memorialized as part of the bank's official records. *Id.* at 454, 62 S.Ct. at 678. When the FDIC later attempted to enforce the note, the Supreme Court rejected the borrower's defense that he had agreed with the bank that the note would not be called for payment. This unrecorded understanding violated a federal policy of protecting the FDIC against "secret agreements." *Id.* at 461, 62 S.Ct. at 681. The Court described the basic test for this doctrine of estoppel as involving a determination:

> whether the note was designed to deceive the creditors or the public authority, or would tend to have that effect. It would be sufficient in this type of case that the maker lent himself to a scheme or arrangement whereby the banking authority on which [the FDIC] relied in insuring the bank was or was likely to be misled.

*Id.* at 460, 62 S.Ct. at 681. The Court thus acted to estop borrowers from avoiding repayment to the FDIC by pleading unofficial "arrangements or schemes" that tend to misrepresent the actual value of a bank's assets.

The First Circuit has interpreted the *D'Oench* doctrine to bar defenses or claims that derive from "secret agreements that tend to make the FDIC susceptible to fraudulent arrangements." *Timberland Design, Inc. v. First Service Bank for Sav.*, 932 F.2d 46, 48 (1st Cir.1991). In order to "lend himself" to such a scheme, the borrower need not intend to defraud, and is sufficiently at fault simply by failing to reduce the agreement pled in defense to writing. *Id.* at 48–49. Moreover, *D'Oench* estoppel is not limited to defenses to FDIC actions, but also operates to bar affirmative claims which are similarly premised on "secret" agreements. *Id.* at 49.

Congress codified this estoppel doctrine in 12 U.S.C. § 1823(e).[3] The codification reads as follows:

---

**3.** This section was amended by the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), which applied the section to the FDIC when it acts as receiver. *See Timberland Design, Inc. v. Federal Deposit Ins. Corp.*, 745 F.Supp. 784, 788 (D.Mass.1990),

No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it under this section or section 11 [12 U.S.C. § 1821], either as security for a loan or by purchase or as receiver of any insured depository institution, shall not be valid against the [FDIC] unless such agreement—

(1) is in writing,

(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

(3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

(4) has been, continuously, from the time of its execution, an official record of the depository institution.

The statute thus enforces the *D'Oench* doctrine by requiring that any "agreement" that might diminish the value of an asset acquired by the FDIC be formally recorded as part of a bank's official records. For the purposes of the instant motion, the problem lies in determining in a principled way what constitutes an "agreement" within the meaning of the statute.

The Supreme Court shed light on the meaning of that term in a recent case recognizing broad applicability for § 1823(e). In *Langley v. Federal Deposit Ins. Corp.*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987), to finance the purchase of land, the petitioners borrowed money from an FDIC insured bank and executed a note, mortgage, and personal guaranty in consideration for the loan. When the petitioners failed to pay an installment due on the note, the bank sued, and the petitioners counterclaimed, asserting both as a defense and as part of their affirmative claim fraudulent inducement. They alleged that the note had been procured by the bank's misrepresentations about the acreage of the property, its mineral content, and the absence of mineral leases on the land.

These misrepresentations were not reflected in the records of the bank or the documents executed by the borrowers. 484 U.S. 86, 88, 108 S.Ct. 396, 399–400, 98 L.Ed.2d 340 (1987).

The Court held that § 1823(e) barred the fraudulent statement claim in the circumstances of this transaction. Justice Scalia interpreted the bank's oral promises about the size and nature of the land as a warranty whose truthfulness "was a condition to performance of [petitioners'] obligation to repay the loan." *Id.* at 91, 108 S.Ct. at 401. As such, the bank's alleged misrepresentations were part of the parties' "bargain" and within the scope of "agreement" as that term is used in § 1823(e). "Agreement," in other words, embraces conditions to payment of promissory notes, including the truthfulness of a warranted fact, such as the size of land to be purchased. *See id.* at 92, 108 S.Ct. at 401–02. Because the borrowers neglected to include the warranty and condition in the note, they were barred by the statute.

In making this assessment, the Supreme Court identified two essential purposes of § 1823(e). First, by requiring that side agreements be recorded properly, the statute permits federal and state banking authorities to rely confidently on a bank's records in evaluating the worth of the bank's assets. Second, the contemporaneousness and board approval requirements ensure "mature consideration of unusual loan transactions by senior bank officials, and prevent fraudulent insertion of new terms, with the collusion of bank employees, when a bank appears headed for failure." *Id.* at 92, 108 S.Ct. at 401. I bear these two policies in mind as I assess the FDIC's claims of estoppel in this case.

■ The combined weight of *D'Oench, Langley,* and § 1823(e) disposes of certain of Desmond's claims. A number of counts in the Complaint are based on the allegation that Eliot repudiated a promise to accept $4,000,000 in settlement of all of Desmond's obligations to the bank. Complaint at ¶ 19. That promise to accept significant-

ly less than the face value of the notes appears nowhere in the official records of the bank. This type of "secret"—that is, unrecorded—settlement agreement falls squarely within the proscription of the estoppel doctrine. *See Morgan v. Heights Savings Association,* 741 F.Supp. 620, 622 (E.D.Tex.1990) (*D'Oench* prohibits enforcement of oral settlement agreements modifying promissory note held by FDIC insured bank). By failing to commit the settlement agreement to writing, Desmond "lent himself" to a scheme which created an inaccurate picture of the worth of Desmond's various notes to the bank. *See Timberland,* 745 F.Supp. at 786, 787. As the plaintiff initially conceded at oral argument, he is thus estopped from asserting *any* claims based on the alleged agreement. *See Timberland,* 932 F.2d at 49. Consequently, I will grant the defendant's motion for summary judgment with respect to Count II for breach of the settlement agreement; Count III insofar as it seeks damages for Eliot's alleged misrepresentation of its intention to accept the settlement; and Count X alleging that the defendant is estopped from repudiating the settlement. The other counts are more generically pled as torts or contractual breaches; to the extent they are premised on the settlement agreement, they too do not survive the FDIC's motion.

■ Elsewhere in his Complaint, Desmond asserts an additional oral promise by Eliot not to seize collateral at Strawberry Hill Farm as long as negotiations were pending. Complaint at ¶ 25. Again, this type of unrecorded modification of a debtor's obligations is unenforceable against the FDIC under *D'Oench* and its common law and statutory progeny. Indeed, *Langley* specifically held that unwritten conditions to performance of a borrower's obligations constitute "agreements" barred from consideration by § 1823(e). 484 U.S. at 92, 108 S.Ct. at 401–02. The promise not to foreclose on the Strawberry Hill Farm property while negotiations continued contained just such a condition. I consequently will grant summary judgment against

Count III as it pertains to misrepresentations about the Strawberry Hill Farm collateral and against the other counts to the extent they are based on the same alleged misrepresentation.

The remaining claims do not permit such easy disposition. Count III alleges further misrepresentation in Eliot's failure to advise Desmond that it would seek to have Desmond's attorney withdraw from representing Desmond. Eliot's silence here is more in the nature of an omission than an affirmatively false representation. A number of courts have read *Langley* to preclude not only claims of "overt misrepresentation," but "deceitful omission" as well. *See, e.g., Federal Deposit Ins. Corp. v. Bell,* 892 F.2d 64, 66 (10th Cir.1989), *cert. dismd.,* 496 U.S. 913, 110 S.Ct. 2607, 110 L.Ed.2d 286 (1990); *Federal Deposit Ins. Corp. v. Hudson,* 800 F.Supp. 867, 871 (N.D.Cal.1990); *Federal Deposit Ins. Corp. v. Sullivan,* 744 F.Supp. 239, 242–43 (D.Colo.1990). The omissions in those cases relate directly to essential contractual terms akin to the warranty of acreage in *Langley.* In *Bell,* the Court ruled that Bell was estopped from asserting that the bank that had persuaded him to buy an oil refining company failed to disclose an internal report that valued the company's properties at $22.3 million less than estimates the bank previously furnished to Bell. 892 F.2d at 65. Similarly, in *Hudson,* the defendant was precluded from claiming that Centennial Savings and Loan had induced her to purchase stock in the savings and loan without disclosing facts relevant to its dubious financial status. *Hudson* at 869, 871. Just as the bank in *Langley* falsely represented the size of a tract of land, the financial institutions in these cases deceived borrowers by failing to disclose the actual value of certain items of purchase. As the Tenth Circuit explained, if "agreements" under § 1823(e) include fraudulent warranties, "it is irrelevant whether the fraud was caused by overt misrepresentation or deceitful omission." *Bell,* 892 F.2d at 66.

The misrepresentation alleged here is different in kind. Desmond asserts that the bank failed to disclose a conflict of interest that would affect his relationship with his lawyer, not that the bank somehow omitted a fact material to the subject matter of a transaction. Stated differently, warranties as to value seem more naturally to fall within the confines of an "agreement" than do external facts—such as a lawyer's conflict of interest—which have a fortuitous tendency to influence the progress of negotiations. Warranties, whether made false by affirmative misstatements or by material omissions, are at the heart of a bargain; legal representation, though essential, is peripheral to the agreement.

In any case, I need not definitively decide whether *Langley* would reach a misrepresentation or omission about a lawyer's dual representation as alleged here. As I read the Complaint, Desmond asserts far more than simple non-disclosure and describes an affirmative intentional tort. He alleges that Eliot knew about the potential for conflicting legal representation, waited until a sensitive juncture during negotiations, and then caused the attorney to withdraw in order to obtain unfair leverage over an unprepared Desmond. A bank officer thereupon allegedly forced Desmond immediately to sign the forbearance agreement without having reviewed it or discussed it with replacement counsel. *See* Complaint at ¶¶ 10–15. In short, Desmond attempts to make out a claim of duress, in which the bank affirmatively created coercive conditions that caused Desmond to execute an oppressive agreement. Because this claim goes far beyond misrepresentation, I opt to dismiss Count III for misrepresentation and analyze the duress claim as it pertains to the other counts. Before I reach the merits of this duress claim, however, I must determine whether Desmond is estopped from making it under § 1823(e).

### III. THE FDIC AND DURESS ALLEGATIONS

There is a distinct split in the case law over whether defenses and claims of duress survive *Langley* 's expansive construction of § 1823(e). That split is complicated by the tendency of the various courts to pursue entirely different lines of argument and focus on different language from *Langley* and from the statute. For example, *Federal Deposit Ins. Corp. v. Meyer*, 755 F.Supp. 10, 12–14 (D.D.C.1991), holds that a defense of economic duress generally is barred by § 1823(e), because it represents a "personal" rather than a "real" defense. The *Meyer* Court draws its conclusion from *Langley* 's interpretation of § 1823(e)'s requirement that the agreement pled in defense diminish the FDIC's "right, title or *interest*" in an asset it acquires. *See Langley*, 484 U.S. at 94, 108 S.Ct. at 402 (emphasis added). Justice Scalia explained that real defenses, such as fraud in factum, render an instrument entirely void, leaving no "interest" to be diminished by any agreement and thus taking such real defenses out of § 1823(e) altogether. *Id.* From this analysis, the *Meyer* Court reasons that, since economic duress is a personal defense rendering an instrument merely voidable rather than void, that instrument constitutes an interest "that § 1823(e) protects from being diminished or defeated." 755 F.Supp. at 14. *See Federal Savings and Loan Ins. Corp. v. Maio*, 736 F.Supp. 1039, 1041 (N.D.Cal.1989) (under *D'Oench*, duress which renders an instrument voidable is not a defense to enforcement of a note); *Federal Deposit Ins. Corp. v. Gettysburg Corp.*, 760 F.Supp. 115, 117 (S.D.Tex.1990) (stating without explanation that *Langley* bars claims of economic duress), *aff'd without opinion*, *Unitedbank v. Gettysburg Corp.*, 952 F.2d 400 (5th Cir.1992).

I do not accept this analysis as dispositive of whether duress is a viable claim for borrowers after *Langley*. It is true that economic duress renders an instrument voidable rather than void, *see, e.g., Ismert and Associates v. New England Mut. Life Ins.*, 801 F.2d 536, 547–48 (1st Cir.1986) (quoting *Rosenbloom v. Kaplan*, 273 Mass. 411, 417, 173 N.E. 522 (1930)), and thus does not prevent a note from amounting to an "interest" within the statute's protections. Nevertheless, even if the FDIC acquires a legitimate "inter-

est" in a note, § 1823(e) is not triggered unless a side "agreement" diminishes the value of the note.[4] However liberal *Langley*'s construction of the statute may be, the opinion does not dispense altogether with the primary requirement that the defense or claim precluded derive from some form of alleged "agreement."[5]

This understanding of the various requirements embodied in *D'Oench* and § 1823(e) finds implicit support in the First Circuit's recent opinion in *In re 604 Columbus Avenue Realty Trust*, 968 F.2d 1332 (1st Cir.1992). In *604 Columbus Avenue Realty Trust*, a realty trust defaulted on a series of loan agreements, but claimed that the initial agreement was infected by a kickback arrangement, whereby a loan officer ensured bank approval for the loans in exchange for an unauthorized payment of $26,300. *See id.*, at 1337. The First Circuit, noting that *D'Oench* " 'operates to bar affirmative claims as well as defenses which are premised upon secret agreements,' " *id.* at 1344 (citation omitted), affirmed the lower court's holding that the trust's tort and contract claims were estopped as deriving from the secret kickback scheme. *Id.* at 1345–46. The Court emphasized that *D'Oench* bars claims " 'as long as those claims *arise out of an alleged secret agreement.*' " *Id.* at 1345 (citation omitted; emphasis in original).

Having thus applied *D'Oench* to the secret kickback agreement, the Court only then addressed the trust's second argument that fraud in factum nonetheless placed its claims within one of the "recognized exceptions" to the estoppel doctrine. *See id.* at 1346. The Court cited *Langley* for the proposition that some defenses, such as fraud in factum, render an instru-

ment void rather than merely voidable, and its own earlier holding that, in the case of fraud in factum, " " 'the instruments would be void rather than voidable, leaving no title capable of transfer to the FDIC.' " *Id.* at 1346–47 (quoting *Federal Deposit Ins. Corp. v. Caporale*, 931 F.2d 1, 2, n. 1 (1st Cir.1991)). Finding the kickback agreement to amount only to fraud in the inducement, the Court declined to apply this exception to *D'Oench* to the realty trust's claims.

By treating the trust's claims in this sequential fashion, the Court in *604 Columbus Avenue Realty Trust* recognized, as does *Langley*, that *D'Oench* and § 1823(e) may involve several phases of inquiry. When the FDIC invokes the estoppel doctrine, the court must initially ask whether the claim to be estopped derives from a "secret agreement"—the primary evil with which *D'Oench* and *Langley* are concerned. If the claim or defense is barred on these grounds, the court may nevertheless still inquire into whether the disputed instrument is entirely void, and therefore does not constitute an "interest" or "title" properly in the FDIC's possession. The issue of whether to apply the "recognized exception" for void instruments, in other words, may become relevant if *D'Oench* and § 1823(e) are initially brought into play by the existence of a secret agreement.

Thus, the determination of whether a given claim of duress survives the estoppel doctrine should not hinge solely on whether or not the duress makes the instrument entirely void and thus strips the FDIC of a legitimate "title" or "interest" in an asset. *But see Meyer*, 755 F.Supp. at 14; *Maio*, 736 F.Supp. at 1041. Rather, a proper

---

**4.** Indeed, in *Langley*, Justice Scalia expressly recognized that the "agreement" and "interest" wording in the statute each lead to separate inquiries; he first discussed whether fraudulent inducement is part of an "agreement," and then addressed whether that fraud was relevant to "another requirement" in the statute that the FDIC possess "right, title, or interest" in the disputed asset. *See* 484 U.S. at 94, 108 S.Ct. at 402.

**5.** *Meyer* also includes as part of its duress analysis the contention that "§ 1823(e) operates to

place the FDIC in the position of a holder in due course, taking promissory notes free of personal defenses." 755 F.Supp. at 12. As explained below in Part IV, I perceive the holder in due course doctrine to derive, not from the statute, but from federal common law. To the extent that *Meyer* conflates the holder in due course doctrine with § 1823(e) in its analysis of duress as a personal defense, I decline to follow its lead.

analysis focuses principally—and more appropriately, I believe—on the "agreement" language in § 1823(e) when asking whether duress may yet be pled in defense of an FDIC action. In *In re Pernie Bailey Drilling Co., Inc.*, 111 B.R. 565, 572 (Bankr.W.D.La.1990), the debtor claimed that the bank used its position as creditor to coerce the debtor into granting the bank a security interest in virtually all of the debtor's assets. After a lengthy discussion of *Langley* and related cases, the Court refused to grant the FDIC's motion for summary judgment against the duress claims contained in the debtor's Complaint. The Court explained,

> Typically, the cases concluding that *D'Oench* or Sec. 1823(e) bars defenses involve breach of an agreement broadly interpreted to include a counterpromise as well as the truthfulness of a warranted fact. Duress may be considered an "outside" condition leading to the signing of a note, from which, by definition, the borrower cannot protect either himself or banking authorities. One who executes an instrument under duress may not have lent himself to a scheme or arrangement likely to mislead banking authorities.

*Id.* at 573. By thus characterizing duress as an "outside" condition, the *Pernie* Court recognizes that conditions of duress are usually not part of the parties' bargain. While I have some reservations as a factual matter about whether the duress at issue in *Pernie* should be characterized as an "outside" condition, the legal analysis appears sound. Unlike, for instance, the warranted size of the property in *Langley* or the misrepresented value of the oil company in *Bell*, elements of duress are generally not susceptible to official recording in a bank's records. Ordinarily, when a borrower is subject to actionable duress, he is not lending himself to a fraudulent scheme by failing to record a material term of a contract or a condition to payment of a

note. The external pressure of duress, in other words, is generally not part of an "agreement." *See also Federal Deposit Ins. Corp. v. Linn*, 671 F.Supp. 547, 555 (N.D.Ill.1987) (1823(e) denies validity only to unwritten agreements and does not bar defense of duress) [6]; *Federal Deposit Ins. Corp. v. Morley*, 867 F.2d 1381, 1385 n. 5 (11th Cir.) (noting, without deciding issue, those courts that hold that § 1823(e) does not bar duress defenses), *cert. denied*, 493 U.S. 819, 110 S.Ct. 75, 107 L.Ed.2d 41 (1989).

The First Circuit has never decided whether claims of duress can be asserted without violating § 1823(e). Courts in this jurisdiction, however, have employed an analysis similar to *Pernie*'s by focusing on whether a given species of defense is part of an "agreement" within § 1823(e)'s purview. As already noted, *604 Columbus Avenue Realty Trust* at 1345–46 applied *D'Oench* estoppel to a plaintiff's tort and contract claims precisely because those claims were premised on a secret kickback agreement.

In *New Connecticut Bank & Trust v. Stadium Mgt.*, 132 B.R. 205, 207 (D.Mass. 1991), the defendant borrowers asserted that the bank, through the blunders of its designated manager, permitted the value of their collateral to decline sharply. In deciding whether this impairment of collateral defense was estopped, Judge Tauro observed that "*D'Oench* and its statutory embodiment [§ 1823(e) ] aim primarily at the evils of secret agreements." *Id.* at 209. Noting that *D'Oench* is designed to promote proper documentation of financial obligations, he then permitted the defense on the grounds that "a lender's negligence is not a detail of the transaction that a maker or obligor can predict, let alone record." *Id.* at 209–10. This approach echoes *Pernie*'s reasoning that duress is an "outside" condition, remote from the details of a transaction and capable neither of prediction nor commitment to formal written rec-

---

**6.** *Linn* was decided only months prior to *Langley* and thus did not have the benefit of the Supreme Court's interpretation of the term "agreement" in § 1823(e). Judge Shadur, the author of *Linn*, however, later reaffirmed that

holding as consistent with *Langley*, albeit on somewhat different grounds. *Resolution Trust Corp. v. Ruggiero*, 756 F.Supp. 1092, 1095 n. 5 (N.D.Ill.1991).

ords. *Pernie* and *New Connecticut Bank* are persuasive that at least some forms of duress may escape § 1823(e) proscription.

▆▆▆ To be sure, every defense or claim pled as duress does not survive § 1823(e). A defaulting borrower could plead a bank's unyielding bargaining position as "duress"—for instance, a bank's threat to seize collateral of sentimental value if a borrower did not agree to pay by a certain date. Such claims would be estopped, because they derive from the bargaining process itself, from the positions parties adopt and agreements they make in trying to exact concessions from one another. Desmond, on the other hand, alleges something more than coercive bargaining stances. He alleges that Eliot surreptitiously allowed a conflict of interest to develop and then forced the attorney's withdrawal precisely in order to put pressure on Desmond to sign an agreement in haste and without counsel. He alleges that Eliot in effect went outside of the terms of the agreement—the money owed, the collateral at stake, the time and methods of payment—to create a situation in which Desmond was unable to make contractually prudent choices. If Desmond's allegations are true, Eliot did not simply put pressure on him by imposing unreasonable time constraints, but rather tortiously deprived him of a meaningful opportunity to protect himself.

I am further persuaded in my judgment that Desmond should be permitted to assert his duress claim by the policies underlying § 1823(e). The Supreme Court identifies those policies as preserving the accuracy of records on which banking authorities rely and ensuring that bank officials maturely consider loan transactions with a potential to devalue a bank's assets. *Langley,* 484 U.S. at 91–92, 108 S.Ct. at 401. Neither of these purposes would be furthered by precluding Desmond's claim of duress. By its very nature, the duress alleged here could not have been recorded as a term, condition, or warranty of the forbearance agreement. Nor would the bank's officials in this situation have maturely considered, in the sense that *Lang-*

*ley* envisioned, a transaction purportedly designed to extort concessions from a borrower. Desmond's duress claim, to the extent that it transcends mere misrepresentation or hardnosed bargaining, does not spring from anything approaching an "agreement," and therefore escapes the proscriptions of the federal estoppel doctrine.

## IV. THE HOLDER IN DUE COURSE DOCTRINE

The FDIC argues alternatively that Desmond's defenses and claims are defeated by the federal holder in due course doctrine developed by courts contemporaneously with the passage of § 1823(e). *See* Memorandum of Reasons Why Motion for Summary Judgment on Complaint Should be Granted at 14–18. The First Circuit recently explored the history of this somewhat imprecise doctrine by citing the Eleventh Circuit's seminal holding that

[A]s a matter of federal common law, the FDIC has a complete defense to state and common law fraud claims on a note acquired by the FDIC in the execution of a purchase and assumption transaction, for value, in good faith, and without actual knowledge of the fraud at the time the FDIC entered into the purchase and assumption agreement.

*604 Columbus Avenue Realty Trust* at 1350 (quoting *Gunter v. Hutcheson,* 674 F.2d 862, 873 (11th Cir.), *cert. denied,* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982)). The Court then noted that other Circuits have expanded the federal holder in due course doctrine to bar in the appropriate circumstances not only claims of fraud, but *all* personal defenses against the FDIC. *Id.; see, also, Campbell Leasing, Inc. v. Federal Deposit Ins. Corp.,* 901 F.2d 1244, 1248 (5th Cir.1990). A number of courts imply that § 1823(e) itself vests the FDIC with holder in due course status, *see, e.g., Meyer,* 755 F.Supp. at 12, but the First Circuit treats the doctrine as the creature of federal common law and as affording protections different from the federal estoppel doctrine. *See 604 Columbus Avenue Realty Trust* at 1349–50; *see also*

*Federal Deposit Ins. Corp. v. Wood,* 758 F.2d 156, 159 (6th Cir.), *cert. denied,* 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 286 (1985) (holder in due course doctrine is not authorized by § 1823(e), but is "part of the federal common law").

The essential purpose behind this broad protection for the FDIC when it holds negotiable instruments is to facilitate purchase and assumption transactions. As the First Circuit has explained, when the FDIC takes over for a failed bank, it generally either liquidates the bank or engages in a purchase and assumption transaction.[7] The latter tack is favored, because " 'it avoids the specter of closed banks and the interruption of daily banking services.' " *604 Columbus Avenue Realty Trust* at 1349 (citation omitted). In other words, by transferring the failed bank's healthy assets to a viable banking institution, the purchase and assumption transaction promotes financial stability and avoids the delays inherent in the process of liquidation. However, this transactional method puts a premium on speed and efficiency, and the holder in due course doctrine is designed to permit the FDIC rapidly to scan the failed bank's books and records to assess its own potential losses. *See id.* Unencumbered by the possibility of personal defenses, the FDIC as a holder in due course can rely on the failed bank's notes as representing transferable or collectible assets.

Of course, to enjoy this considerable protection, the FDIC must first meet the requirement of holder in due course status. *604 Columbus Avenue Realty Trust* does not precisely define how this determination is made—although it does suggest that, in the case of fraud, the FDIC must be a good faith purchaser for value without knowledge of the fraud—but prior decisions of

the First Circuit have looked to state law to determine whether the FDIC is a holder in due course in a given situation. *See Federal Deposit Ins. Corp. v. Grupo Girod,* 869 F.2d 15, 17 (1st Cir.1989) (looking to Puerto Rican law in assessing whether the FDIC might be a holder in due course). Other Circuits have held that the FDIC may enjoy holder in due course status even if it does not satisfy the technical requirements of such status under state law. *See Campbell,* 901 F.2d at 1249; *Wood,* 758 F.2d at 158. I need not enter this thicket, however, because the FDIC is stripped of this protective shield for two other reasons in the instant case.

■ First, the FDIC becomes a holder in due course only with respect to negotiable instruments. *See New Connecticut Bank,* 132 B.R. at 208, 209; *Sunbelt Savings, FSB Dallas, Texas v. Montross,* 923 F.2d 353, 356 (5th Cir.), *reinstated and remanded,* 944 F.2d 227, 228 (5th Cir.1991) (en banc) (taking no position on the negotiability of variable interest rate notes). In *New Connecticut Bank,* Judge Tauro looked to U.C.C. §§ 3–104 and 3–106 and relevant case law to determine whether variable interest rate notes qualified as negotiable instruments containing a promise to pay a "sum certain." 132 B.R. at 208–09. He held that, because the interest rates could only be determined by an external and variable standard, the notes were non-negotiable and prevented the FDIC from enjoying the "blanket protection of a holder in due course." *Id.* Desmond's notes in this case are similarly subject to variable interest rates; they are all payable at interest rates dependent on "the rate of interest announced from time to time by the First National Bank of Boston ... as its base rate." *See* Exhibits C, E, F, G, and I

7. In a purchase and assumption transaction, ... the FDIC, in its capacity as receiver, sells the bank's healthy assets to the purchasing bank in exchange for the purchasing bank's promise to pay the failed bank's depositors. In addition, as receiver, the FDIC sells the "bad" assets to itself acting in its corporate capacity. With the money it receives, the FDIC-receiver then pays the purchasing bank enough money to make up the difference between what it must pay out to the failed

bank's depositors, and what the purchasing bank was willing to pay for the good assets that it purchased. The FDIC acting in its corporate capacity then tries to collect on the bad assets to minimize the loss to the insurance fund. Generally, the purchase and assumption must be executed in great haste, often overnight.

*604 Columbus Avenue Realty Trust* at 1337 (quoting *Timberland,* 932 F.2d at 48).

attached to Linderman Affidavit. They too are subject to an external and variable standard for calculating interest. Moreover, the other documents in the FDIC's possession—the Desmond Guaranty, and the forbearance and security agreements— are all premised on the obligations contained in the notes and thus are equally non-negotiable. *See Federal Deposit Ins. Corp. v. Percival*, 752 F.Supp. 313, 324–25 (D.Neb.1990) (FDIC held not a holder in due course with respect to a guaranty agreement, which does not contain unconditional promise to pay a sum certain and is not payable on demand or at time certain and is therefore non-negotiable). Thus, because the FDIC holds only non-negotiable instruments, it is not entitled to the protections afforded a holder in due course.[8]

■ Second, the thrust of the First Circuit's most recent pronouncement is that the FDIC is not entitled to holder in due course status in the absence of a purchase and assumption transaction. *See 604 Columbus Avenue Realty Trust* at 1352–53. Where the FDIC is concerned only with liquidation, the policies of maintaining uninterrupted banking services and executing a rapid purchase and assumption based on the bank's books do not apply. *See id.* In this case, it appears from the record that the FDIC has chosen to liquidate Eliot rather than to sell its healthy assets to a purchasing bank and consummate a purchase and assumption transaction. Even if it held negotiable instruments, this posture would deprive the FDIC of the protections of a holder in due course under *604 Columbus Avenue Realty Trust.* Thus, both because it holds variable interest rate notes and has not pursued the purchase and assumption path, the FDIC cannot benefit from the federal common law holder in due course rule.

## V. THE TWO CAPACITIES OF THE FDIC

■ The FDIC suggests one final reason why Desmond's claims and defenses are barred. When Eliot faced financial peril, the FDIC took over as liquidating agent of the bank. The FDIC as liquidating agent then assigned to the FDIC in its corporate capacity certain of Eliot's assets, including the Desmond loans, but retained certain of Eliot's liabilities, including the claims asserted by Desmond and Round Hill in the Complaint. *See Timberland*, 932 F.2d at 48 (describing how FDIC functions in corporate and receiver capacity). Thus, FDIC-corporate possesses only the assets and none of the liabilities of Eliot. Based on this assignment, the FDIC concludes that Desmond is precluded from making any claims or asserting any defenses against FDIC-corporate. *See* Memorandum of Reasons Why Motion for Summary Judgment on Counterclaim Should be Granted at 10–13.

A quick review of the procedural history of this case does much to clarify this circuitous argument. On December 19, 1990, Magistrate Judge Bowler allowed the FDIC's motion to substitute the FDIC, *as liquidating agent*, for Eliot Savings Bank as the defendant in the filed complaint. Thus, the plaintiff's affirmative claims are against the FDIC as liquidating agent—a posture with which the FDIC does not quarrel—and not against FDIC corporate. However, on the same day as the previously mentioned order, Magistrate Judge Bowler allowed the FDIC's motion to substitute the FDIC in its *corporate capacity* as the plaintiff-in-counterclaim suing to collect on the loans. The result is that the defendant in this suit is FDIC as liquidating agent, while FDIC-corporate is the party asserting the counterclaims.

Since the FDIC as liquidating agent is, by its own admission, the appropriate de-

---

**8.** I note that the First Circuit has held that § 1823(e) applies to negotiable as well as non-negotiable instruments. *See Federal Deposit Ins. Corp. v. P.L.M. International, Inc.*, 834 F.2d 248, 255 (1st Cir.1987). My ruling here does not conflict with that holding. As already described, § 1823(e) targets the evils of secret agreements, and thus would apply regardless of the nature of the instrument forming the basis of the claim. The holder in due course doctrine, on the other hand, is a separate common law doctrine that protects the FDIC from certain defenses where it holds negotiable instruments. *See New Connecticut Bank*, 132 B.R. at 208.

fendant, the argument ultimately boils down to a claim that Desmond cannot assert his defenses against FDIC-corporate, which obtained only the assets but none of the liabilities of Eliot. In this regard, the FDIC cites *Trigo v. Federal Deposit Ins. Corp.*, 847 F.2d 1499 (11th Cir.1988), where the plaintiff sued FDIC-corporate to rescind a contract for deed. Pursuant to a purchase and assumption transaction, FDIC-corporate had purchased the contract for deed but expressly did not assume the obligations of the failed bank. The Court held that the plaintiffs could have sued the banks involved or the FDIC as liquidator, but that they "sued the wrong party" in FDIC-corporate, which was not a party to the contract and not subject to liabilities deriving from that contract. *Id.* at 1502.

Here, Desmond and Round Hill have not "sued the wrong party," because the defendant to their claims is the FDIC as liquidating agent, which "stepped into the bank's shoes" as far as liabilities on the loan documents are concerned. *See id.* As to Desmond's defenses, *Trigo* expressly limited its holding to instances in which the FDIC is the defendant to a borrower's claims. The Court explained that its reasoning would not apply if FDIC-corporate were trying to collect payments as a plaintiff and the borrowers asserted *defenses* to that effort. *Id.* at 1503 & n. 5.[9] In the instant case, FDIC-corporate is, in fact, a plaintiff; its only role in this lawsuit is to assert counterclaims for collection against Desmond and Round Hill as defendants-in-counterclaim. Thus, by the logic of the very case the FDIC cites, the argument fails.

While the 11th Circuit's distinction between FDIC-corporate as plaintiff and defendant does not bind me, I adopt its reasoning as eminently sensible. Where the borrower is the plaintiff, he is in the position to choose properly to sue that segment of the FDIC that holds a bank's liabilities—the FDIC as liquidating agent. However, where the borrower is sued by the FDIC-corporate, he can only defend against the entity that sued him and would lose his defenses if the FDIC's argument were adopted. The instant case highlights the unfairness of such a scheme. I embrace *Trigo*'s distinction as the best approach, and permit the duress allegations both as claims and defenses.

## VI. THE DURESS CLAIMS ON THE MERITS

■ Having decided that Desmond can indeed assert his claim that he signed the forbearance agreement under duress, I move to the merits of that claim. The counts that may survive the federal estoppel doctrine include Count I for intentional tort, Count IV for breach of the covenant of good faith and fair dealing, Count V for tortious interference with business relations, Count VI for negligence, Count VII for breach of duty and failure to act in a commercially reasonable manner, Count VIII for unfair and deceptive acts in violation of Mass.Gen.L. ch. 93A, §§ 2 and 11, and Count IX for declaratory judgment. To the degree these counts survive, however, they are all dependent to some degree on the duress argument, and the FDIC's motions hinge on whether Desmond has raised a genuine dispute as to facts material to this claim.

Massachusetts courts apply two tests to determine whether a party has been subject to economic duress in entering an agreement. In *International Underwater Contractors, Inc. v. New England Tel. & Tel. Co.*, 8 Mass.App.Ct. 340, 343–44, 393 N.E.2d 968 (1979), New England Telephone (NET) contracted for the plaintiff to install conduits under the Mystic River. NET then insisted on deviations from the contract that imposed additional costs on the plaintiff, and refused to make payments under the contract for a year. After the plaintiff was plunged into financial difficulties, NET allegedly proffered a release to the plaintiff on a "take-it or leave-it basis."

---

9. Indeed, as support for this distinction, the *Trigo* court, 847 F.2d at 1503, cited a First Circuit case to justify the proposition that defendants may assert defenses against FDIC-corporate based on bilateral contracts. *See Federal Deposit Ins. Corp. v. Panelfab Puerto Rico, Inc.*, 739 F.2d 26 (1st Cir.1984).

The court refused to grant summary judgment against the plaintiff's claim that it had signed the release under economic duress. The Court explained,

> To show economic duress (1) a party "must show that he has been the victim of a wrongful or unlawful act or threat, and (2) such act or threat must be one which deprives the victim of his unfettered will." 13 Williston, Contracts § 1617, at 704 (3d ed. 1970). "As a direct result of these elements, the party threatened must be compelled to make a disproportionate exchange of values." *Id.*

The elements of economic duress have also been described as follows: "(1) that one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that said circumstances were the result of coercive acts of the opposite party."

*Id.* at 342, 393 N.E.2d 968 (citations omitted); *Ismert,* 801 F.2d at 544 (quoting same).

Here, Desmond has alleged by affidavit (1) that the bank's executive vice-president admitted that Eliot had always known that Desmond's attorney belonged to a firm that represented the bank on other matters; (2) that the bank officer insisted that Eliot could no longer abide the conflict of interest; and (3) that the bank then proffered the forbearance agreement and insisted that Desmond sign it immediately, before he could even review its terms. *See* Desmond Affidavit at ¶¶ 9–12. The FDIC does not deny that any of this exchange occurred but defends on the grounds that it had a clear right to object to a perceived conflict of interest. *See* FDIC Memorandum on Duress Issue at 6–7. Drawing all reasonable inferences in Desmond's favor, I hold that he has made out a showing of duress adequate to survive summary judgment.

Applying the first test suggested in *International Underwater,* I find that purposefully depriving Desmond of his attorney during a sensitive time in the negotiations and then demanding execution of the agreement forthwith can be found to have been a wrongful act that deprived Desmond of his "unfettered will." *See Oglesby v. Coca–Cola Bottling Co. of Chicago/Wisconsin,* 620 F.Supp. 1336, 1342–43 (N.D.Ill.1985) (where plaintiff was forced to sign release on take-it-or-leave-it-basis, absence of counsel considered a factor relevant to duress); *see also Ismert,* 801 F.2d at 545 (noting cases that view a party's representation by counsel as relevant to duress claims). It is unclear from the lengthy forbearance and security agreements whether the plaintiff was thereby "compelled to make a disproportionate exchange of values," *see International Underwater,* 8 Mass.App.Ct. at 342, 393 N.E.2d 968, but I note that the security agreement did, in fact, grant Eliot nearly everything Desmond owned as collateral, *see* Exhibit J, Linderman Affidavit,[10] and that the forbearance agreement released Eliot from any claims based on any acts prior to the agreement's execution. *See* Exhibit H at 3–4, Linderman Affidavit. Desmond asserts that this agreement is oppressive and unfair; the FDIC declines to discuss the fairness of the terms of the agreement. For the purposes of summary judgment, I find a reasonable fact finder could adopt Desmond's position that this modification of the loans was an imbalanced one.

I reach the same conclusion when applying the second test proposed by *International Underwater.* This test focuses on whether one party has acted coercively to create circumstances in which the other party involuntarily accepts an agreement as his only alternative. *See International Underwater,* 8 Mass.App.Ct. at 342, 393 N.E.2d 968. As alleged, Desmond's predicament at the meeting with Eliot's officer afforded him little practical alternative; either he would sign the documents proffered or Eliot would proceed against him and Round Hill. Where one party thus acts to strip the other of an opportunity to

---

**10.** Briefly stated, the security agreement executed simultaneously with the forbearance agreement gave Eliot a security interest in all of Desmond's inventory, receivables, instruments, intangibles, goods, and computer software.

exercise any meaningful choice in entering into a contract, an action for duress may lie.

Desmond's preliminary showing of duress supports a number of the remaining counts of his Complaint. Count IV alleges a breach of the covenant of good faith and fair dealing, which provides that neither party may "do anything that will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract." *Anthony's Pier Four, Inc. v. HBC Associates,* 411 Mass. 451, 471–72, 583 N.E.2d 806 (1991) (citations omitted). If Eliot did in fact act to coerce Desmond into an unreasonable modification of the loan agreements, it may have breached this duty to behave fairly and in good faith. Moreover, the Supreme Judicial Court held in *HBC* that a breach of the covenant amounted to a violation of Mass.Gen.L. ch. 93A, § 11. *Id.* at 476, 583 N.E.2d 806. Thus, by showing that Eliot breached his duty of good faith and fair dealing, Desmond may concomitantly be able to prove the allegations in Count VIII for unfair and deceptive acts in violation of ch. 93A.

Count XI requests a declaratory judgment that the forbearance agreements are void and unenforceable. As already noted, duress generally renders a contract voidable rather than void. However, for the reasons outlined above, Desmond may be able to prove that these agreements are indeed unenforceable. To the extent that Count XI seeks a declaration that the forbearance and security agreements and the accompanying promissory note are unenforceable, it survives summary judgment.

The other counts assert more nebulous claims. Count I claims that Eliot committed an intentional tort by maliciously causing harm to Desmond and improperly using "leverage over Desmond to cause Desmond to acquiesce to the Bank demands." This claim remains unfocused because the parties have declined to brief it. I will allow summary judgment as to Count I.

I am similarly unable to perceive any legitimate basis for the negligence claim in Count VI. Presumably, as an alternative to his theory that Eliot deliberately created conditions of duress, the plaintiff intends to charge the defendant with negligently allowing a conflict of interest to develop and undermine negotiations between the parties. Desmond, however, fails to identify any duty on the part of Eliot to ensure that its borrowers' attorneys are not otherwise involved with the bank. The duty would appear to be the attorney's. In the absence of such a duty, Count VI cannot survive summary judgment.

Count VII, alleging a failure to act in a commercially reasonable manner, is also murky and unsupported. The duty alleged typically arises in specific contexts, such as a secured party's obligation to dispose of collateral in a commercially reasonable manner under Mass.Gen.L. ch. 106, § 9–504(3). *See, e.g., Shawmut Worcester County Bank, N.A. v. Miller,* 398 Mass. 273, 496 N.E.2d 625 (1986). The obligation of commercial reasonableness is not, however, a generally applicable principle akin to the covenant of good faith and fair dealing. Without being directed to any case or statute that triggers an obligation of commercial reasonableness, I decline to fabricate one. In any event, to the extent Count VII is duplicative of the alleged breach of good faith and fair dealing, it need not remain part of this lawsuit. I consequently grant the FDIC's motion for summary judgment against Count VII.

The sole remaining claim is Count V for tortious interference with business relations. Unlike Count I for intentional tort, which I have read to base liability on Eliot's interference with Desmond's relationship with his attorney, this Count alleges that the bank intentionally impeded Desmond's "business relationships." In Massachusetts, to make out such a claim, the plaintiff must show (1) that he had a contract with a third party; (2) the defendant knowingly induced the third party to break the contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions. *G.S. Enterprises, Inc. v. Falmouth Marine, Inc.,* 410 Mass. 262, 272, 571 N.E.2d 1363 (1991). Desmond has advanced no facts supportive of such a claim.

He fails to specify any contracts he held with third party businesses, much less that Eliot interfered with those contracts. Thus, I grant summary judgment on Count V.

Given my disposition of the counts of the Complaint, I need not discuss the FDIC's motion for summary judgment on its Counterclaims. All four counts of the Counterclaims are based on the initial loan documents, "as modified by the forbearance agreement." Because there are material factual disputes about the validity of that forbearance agreement, the FDIC cannot enforce that agreement through summary judgment and its motion must be denied.

## VII. CONCLUSION

In summary, for the reasons set forth more fully above:

1. I ALLOW the FDIC's motion for summary judgment against Counts I, II, III, V, VI, VII and X of the Complaint;

2. I DENY the FDIC's motion as to Counts IV, VIII, and IX of the Complaint, to the extent that those Counts may proceed on plaintiff's duress claims;

3. I DENY the FDIC's motion for summary judgment on any of its Counterclaims.