CELTIC DEVELOPMENT CORPORA-
TION, Celtic Equipment Company, Inc.,
Celtic Concrete Form Company, Inc.,
Kenneth S. Racicot and Thomas D. Ra-
cicot, Trustees of Pavilion Realty Trust,
Plaintiffs and Defendants in Counter-
claim,

v.

FEDERAL DEPOSIT INSURANCE COR-
PORATION, as Receiver for Merchants
National Bank of Leominster, Defen-
dant, Plaintiff in Counterclaim and
Third Party Plaintiff,

Lynn L. MESSIER and Robert
P. Gallo, Defendants,

v.

Kenneth S. RACICOT, Individually, Rus-
sell W. Racicot, Individually, Thomas D.
Racicot, Individually, Celtic Internation-
al, Ltd., Celtic Construction Company,
Inc., Celtic Realty, Inc., Kenneth S. Ra-
cicot and Thomas D. Racicot, Trustees
of Racicot Realty Trust, Third Party De-
fendants.

Civ. A. No. 92–10607–GN.

United States District Court,
D. Massachusetts.

Nov. 12, 1993.

928

Bernard P. Rome, Rome, George & Klein, Boston, MA, for Celtic Equipment Co. et al. and Kenneth M. Russell and Thomas Racicot.

Bill N. Jacob, James F. Coffey, Boroff & Associates, Robert J. Hoffer, Barron & Stadfeld, Boston, MA, for F.D.I.C.

Leonard F. De Paola, Kleinfeld & De Paola, Boston, MA, for Lynn S. Messier.

GORTON, District Judge.

Report and recommendation accepted and adopted.

### REPORT AND RECOMMENDATION RE: FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR MERCHANTS NATIONAL BANK'S (sic), MOTION FOR SUMMARY JUDGMENT (DOCKET ENTRY # 15)

October 13, 1993.

BOWLER, United States Magistrate Judge.

On June 30, 1993, the Federal Deposit Insurance Corporation ("FDIC"), receiver for Merchants National Bank of Leominster and defendant, plaintiff in counterclaim and third party plaintiff in the instant action, filed a motion for summary judgment. (Docket Entry # 15). The FDIC seeks summary judgment with respect to all claims filed against the FDIC in the verified complaint. In addition, the FDIC moves for summary judgment with respect to counts I and II of the FDIC's counterclaim and third party complaint as to third party defendants Celtic Development Corporation, Celtic Equipment Company, Inc., Celtic Concrete Form Company, Inc., Thomas D. Racicot, individually and as trustee of the Racicot Realty Trust, Russell W. Racicot, individually, Celtic International, Limited, Celtic Construction Company, Inc. and Celtic Realty, Inc. (collectively: "third party defendants").[1]

Plaintiffs, defendants in counterclaim and third party defendants filed a three page opposition to the motion for summary judgment and attached their verified complaint.[2] (Docket Entry # 17). On August 9, 1993, this court held a hearing and took the motion for summary judgment (Docket Entry # 15) under advisement.

## BACKGROUND

In May 1990 plaintiffs Celtic Development Corporation, Celtic Equipment Company, Inc., Celtic Concrete Form Company, Inc., and Thomas and Kenneth Racicot, as trustees of Pavilion Realty Trust, (collectively: "plaintiffs") filed this action in Massachusetts Superior Court against Merchants National Bank of Leominster ("the Bank"), Lynn L. Messier ("Messier"), Senior Vice President of the Bank, and Robert P. Gallo ("Gallo"), Assistant Vice President of the Bank (collectively: "defendants"). The two count verified complaint alleges deceit and violation of Massachusetts General Laws chapter 93A ("chapter 93A") stemming from certain loan transactions in connection with the development of the Pavilion Shopping Center ("the shopping center") in Bellingham, Massachusetts in

1. In its motion for summary judgment as to the counts I and II of the counterclaim, the FDIC states that it asserts the motion against Trustees of Pavilion Realty Trust. (Docket Entry # 15, p. 2). No such party is named in the counterclaim and summary judgment is therefore inappropriate. The motion also refers to Trustees of Racicot Realty Trust. The counterclaim names Kenneth and Thomas Racicot as trustees of Racicot Realty Trust. The FDIC is not seeking summary judgment as to Kenneth Racicot inasmuch as the FDIC believes Kenneth Racicot was discharged in bankruptcy. (Docket Entry # 15, n. 1). Accordingly, this court construes the motion seeking summary judgment on the counterclaim as brought against the above named third party defendants.

2. The opposition pleading fails to identify the specific parties filing the pleading as "[p]laintiffs and [d]efendants in counter claim" and "third party [d]efendants." Celtic Development Corporation, Celtic Equipment Company, Inc., Celtic Concrete Form Company, Inc., and Kenneth and Thomas Racicot, as trustees of Pavilion Realty Trust, filed the attached verified complaint. (Docket Entry # 17).

1986, 1987 and 1988. (Docket Entry #17, Ex. A).

In March 1990 the Bank filed an answer as well as a counterclaim and third party complaint against Celtic Development Corporation; Celtic Equipment Company, Inc.; Celtic Concrete Form Company, Inc.; Kenneth and Thomas Racicot, as trustees of Pavilion Realty Trust; Kenneth, Thomas and Russell Racicot, individually; Celtic International, Limited; Celtic Construction Company, Inc.; Celtic Realty, Inc.; and Kenneth and Thomas Racicot, as trustees of Racicot Realty Trust (collectively: "third party defendants"). The eight count counterclaim includes the following two counts: (1) Count I seeking $351,169.07, including interest, costs and attorneys' fees, as a result of the failure of trustees of Pavilion Realty Trust to pay amounts due and owing under a note dated March 18, 1987; and (2) Count II seeking $351,169.07 against third party defendants as a result of an alleged default under the March 18, 1987 note. In October 1990 the third party defendants filed an answer to the counterclaim.

In December 1991 the United States Office of Comptroller of the Currency declared the Bank insolvent and appointed the FDIC as the Bank's receiver. By Endorsed Order of April 9, 1992, the district judge allowed the FDIC's motion to substitute itself as a party in lieu of the Bank.

Before detailing the record for purposes of summary judgment, it is necessary to determine the contents of the record. The FDIC filed numerous and appropriate documents and affidavits in support of summary judgment as well as a statement of facts in accordance with LR. 56.1. Plaintiffs, however, simply filed a copy of the verified complaint.

Rule 56(c) details the matters which this court can consider on a summary judgment motion. The rule states that summary judgment should be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P.

In the event a complaint is verified, it is appropriate to consider factual averments based on personal knowledge therein as the equivalent of an affidavit for purposes of summary judgment. *Sheinkopf v. Stone*, 927 F.2d 1259, 1262–1263 (1st Cir.1991). An unverified complaint, however, primarily shows "the nature of the cause of action ... and the opposing party can take advantage of any admissions in it." *Ratner v. Young*, 465 F.Supp. 386, 389 & n. 5 (D.V.I.1979). Accordingly, plaintiffs' verified complaint, to the extent based on personal knowledge as opposed to conclusory factual and/or legal allegations, forms a part of the summary judgment record. Based on the pleadings, excerpts of depositions and admissions on file, this court finds the following facts.

In November 1986 Celtic Equipment Company, Inc. ("Equipment") executed a promissory note to the Bank in the principal amount of $650,000 ("November 1986 note"). (Docket Entry #16, Ex. A). In return for the loan, the Bank received a security interest in the equipment and inventory of Equipment ("November 1986 loan"). The security agreement, entitled All Asset Security Agreement, included "all personal property and fixtures." (Docket Entry #16, Ex. B). In conjunction with these transactions and in consideration for the Bank's loan to Equipment, the following individuals and entities executed guaranties in the event of default on the part of Equipment: Kenneth, Russell and Thomas Racicot; Celtic Construction Company, Inc. ("Construction") and Celtic Concrete Form Company, Inc. ("Concrete").[3] (Docket Entry #16, Ex. C).

In September 1987 Kenneth, Russell and Thomas Racicot applied to the Bank for additional funding on behalf of Pavilion Realty Trust ("Pavilion") in order to make certain improvements to the shopping center. After receiving financial statements from the above individuals,[4] the Bank and Pavilion executed

---

3. The guaranties executed by Construction and Concrete are entitled "Unlimited Guaranty."

4. Gallo avers that "plaintiffs submitted financial statements done on a consolidated basis, as well as the principals' personal financial statements"

a Construction Loan Agreement dated October 6, 1987 ("October 1987 loan"). (Docket Entry # 16, Ex. D & K; Docket Entry # 17, Ex. A). In accordance with the agreement, the Bank loaned Pavilion $300,000. (Docket Entry # 16, Ex. D; Docket Entry # 17, Ex. A).

To secure the loan, Pavilion executed a promissory note on October 6, 1987, to the Bank in the principal amount of $300,000 secured by a second mortgage on the shopping center ("October 1987 note"). The October promissory note had a three year term with interest payments to commence on December 31, 1987, and interest and principal payments to commence on January 1, 1988. (Docket Entry # 16, Ex. E; Docket Entry # 17, Ex. A). First Service Bank for Savings [5] held a first mortgage on the property in the original amount of $1,200,000.[6] (Docket Entry # 16, Ex. E & K; Docket Entry # 17, Ex. A).

As additional security for the October 1987 loan to Pavilion, the following individuals and entities executed guaranties on October 6, 1987: Construction; Russell, Kenneth and Thomas Racicot; Equipment; Celtic Development Corporation ("Development"); Celtic International, Limited ("International"); Celtic Realty, Inc. ("Celtic Realty"); and Racicot Realty Trust ("Racicot Realty"). (Docket Entry # 16, Ex. G). The Bank also received "clouds" on the personal residences of Russell, Kenneth and Thomas Racicot in conjunction with the loan. A "cloud" constitutes an agreement whereby the maker agrees not to refinance or otherwise encumber certain property absent agreement of the recipient of the cloud. (Docket Entry # 16, Ex. K).

In December 1987, as averred by Gallo, Equipment sought to amend the November 1986 note. The Bank agreed to permit Equipment to make interest only payments from December 1987 through February 1988 rather than the originally agreed interest and principal payments. (Docket Entry # 16, Ex. K & L). Gallo further attests that in January 1988 plaintiffs advised the Bank that the "Celtic companies" expected to report a loss of $500,000 for the fiscal year ending June 30, 1987.[7] (Docket Entry # 16, Ex. K). The FDIC argues that the above financial status of the companies was contrary to representations made in the financial statements [8] provided to the Bank prior to its approval of the October 1987 loan and therefore constitutes a default. (Docket Entry # 16, pp. 6–7). Under the terms of the Construction Loan Agreement, the following event constitutes a default:

> The occurrence of any material adverse change in the financial condition of [Pavilion] from the financial condition of [Pavilion] as of the date as represented to [the Bank]; provided such condition is not remedied within ten (10) days after notice from [the Bank] to [Pavilion].

(Docket Entry # 16, Ex. D, Section 6.01(K)). Gallo additionally avers that Equipment was late in making payments under the October 1987 loan and thereby incurred late charges. (Docket Entry # 16, Ex. K).

According to the verified complaint, however, signed by Development, Equipment, Concrete, Pavilion and Kenneth Racicot individually, Pavilion "kept current" on the note. (Docket Entry # 16, Ex. A). Furthermore, the financial statements are not contained in the record. Accordingly, this court is at a disadvantage in assessing whether plaintiffs are in default of the October 1987 loan with respect to the allegation of misrepresenting financial data. Accordingly, there exists a material issue of fact regarding the existence of a default under section 6.01(K) of the October 1987 loan.

---

in conjunction with their application for the October 1987 loan. (Docket Entry # 16, Ex. K). The statements, however, are not contained in the summary judgment record.

**5.** The loan document refers to "First Service Bank for Savings." (Docket Entry # 16, Ex. D, p. 15). Plaintiffs' verified complaint refers to "First Service Bank of Leominster." (Docket Entry # 16, Ex. A).

**6.** The FDIC represents that the appraised value of the shopping center at the time was $1,500,-000. (Docket Entry # 16).

**7.** Gallo does not define the "Celtic companies" in the affidavit.

**8.** See footnote number four.

After discussions among the parties (Docket Entry # 16, Ex. K), Gallo attests that Kenneth Racicot represented to the Bank that Development was involved in a joint venture with Milford Savings Bank to sell a condominium project in Bellingham, Massachusetts ("the condominium project") that would yield expected profits in the range of $1,3000,000 to $1,5000,000. Pavilion and "Racicot," presumably Kenneth Racicot, offered to rewrite the note and planned to pay off the balance on the October 1987 loan and to pay a substantial portion ($200,000) of the balance on the November 1986 note, according to Gallo's affidavit. (Docket Entry # 16, Ex. K).

On March 18, 1988, the Bank and Pavilion refinanced their agreements. Pavilion and the Bank executed another promissory note in the principal amount of $300,000 with a six month due date, i.e., September 18, 1988 ("March 1988 note"). (Docket Entry # 16, Ex. H). In addition to executing guaranties and a mortgage similar to those executed in connection with the October 1987 loan, Kenneth, Russell and Thomas converted their "clouds" to second position mortgages in favor of the Bank on their personal residences. (Docket Entry # 16, Ex. H–K; Docket Entry # 17, Ex. A).

According to the verified complaint, plaintiffs state that they were never told that the October 1987 note "was a three year promissory note and was not past-due (sic)." [9] (Docket Entry # 17, Ex. A). Plaintiffs therefore maintain that the Bank "fraudulently induced" them to execute the more stringent terms contained in the March 1988 documents.[10] (Docket Entry # 17, Ex. A).

The closing of the condominium project took place in June 1988. In lieu of receiving the amount owed on the October 1987 loan and a substantial portion of the November 1986 note, the Bank received a parcel of land conveyed to it by Milford Savings Bank. Gallo attests that Milford Savings Bank applied the proceeds of the sale to certain obligations owed to it. (Docket Entry # 16, Ex. K).

At an undetermined time thereafter and upon request, the Bank released the mortgages it held on the personal residences of Kenneth, Russell and Thomas Racicot. (Docket Entry # 16, Ex. K). In September 1988 Development granted another mortgage to the Bank covering property located in Bellingham, Massachusetts as further security for the March 1988 note. (Docket Entry # 16, Ex. M). Although not contained in the mortgage, in the verified complaint plaintiffs maintain that the "clear understanding" of the mortgage was to discharge the mortgage upon payment of $200,000.[11] Gallo avers that there was no such understanding and that the Bank extended the six month due date of the March 1988 note to March 18, 1989, in August 1988. (Docket Entry # 16, Ex. K).

Gallo attests that the last payment on the March 1988 note was made on or about December 8, 1988. Gallo further avers that the March 1988 note is in default and that the Bank gave notice of the default in accordance with the terms of the note and related agreements. As of May 15, 1990, Gallo attests that the sum of $351,169.07 is owed on the March 1988 note. He professes that the November 1986 note is also in default and that the Bank notified Equipment in accordance with the terms of the November 1986 note. Equipment made the last payment on the November 1986 note on December 29, 1988, leaving a balance owed of $243,292.39, according to Gallo's affidavit. After selling certain collateral and after Equipment "voluntarily surrendered" a 1985 Isuzu pickup, the balance owed on the November 1986 note as of May 15, 1990, was $65,961.92, as averred by Gallo (Docket Entry # 16, Ex. K).

---

9. Thomas and Kenneth Racicot signed the note as trustees of Pavilion Realty Trust. The second paragraph of the three page note states that remaining indebtedness "shall be due and payable in three (3) years from date." (Docket Entry # 16, Ex. E).

10. This allegation constitutes one of the "facts" used by plaintiffs to support counts I and II of their verified complaint for deceit and violation of chapter 93A.

11. This allegation also constitutes one of the "facts" used by plaintiffs to support counts I and II of their verified complaint for deceit and violation of chapter 93A. Plaintiffs fail to produce a writing evidencing this "clear understanding."

According to the verified complaint, however, the Bank and Gallo "wrongfully seized" the 1985 Isuzu pickup and the Bank also "wrongfully seized" a 1986 Bronco II truck.[12] Nor, according to the verified complaint, had the Bank informed Equipment that it was in default. (Docket Entry # 17, Ex. A).

As previously noted, the Bank was declared insolvent and the FDIC appointed receiver in December 1991. Roy Hunter ("Hunter"), Bank Liquidation Specialist for the FDIC, avers that, based on his familiarity with the instant litigation, the Bank's files and pertinent loan documents kept in the ordinary course of business, the Bank attempted to foreclose on the overdue notes after the default. As of July 11, 1990, and after collecting a portion of the monies owed, the outstanding balance was $102,104.57 with respect to the March 1988 note. As of July 1, 1993, the amount owed was $115,910.64 with interest accruing thereafter in the daily amount of $12.71. (Docket Entry # 16, Ex. O).

Hunter further avers that the Bank's files do not contain "any documentation, written or otherwise, to support" plaintiffs' allegations of the promises, claims and misrepresentations made in the verified complaint. (Docket Entry # 16, Ex. O). In support of their claim for deceit, plaintiffs allege the following misrepresentations on the part of defendants: (1) misrepresenting to plaintiffs on March 18, 1988, that their October 1987 loan was about to expire; (2) failing to honor their promise to discharge one of the mortgages for $200,000; (3) wrongfully seizing the 1985 Isuzu pickup; and (4) falsely claiming that Development was a guarantor of the obligation owed by Equipment to the Bank. Plaintiffs describe similar misrepresentations to support their claim for violation of chapter 93A. The verified complaint, however, fails to state or refer to a specific writing evidencing the above misrepresentations.

## DISCUSSION

The FDIC moves for summary judgment on all counts contained in plaintiffs' verified complaint and counts I and II of the FDIC's counterclaim. (Docket Entry # 15). Summary judgment is permissible when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Inferences are drawn in favor of plaintiffs, the nonmoving parties. *Space Master International, Inc. v. City of Worcester*, 940 F.2d 16 (1st Cir.1991); *Herbert W. Price v. General Motors Corporation*, 931 F.2d 162 (1st Cir.1991) (record viewed in light most favorable to nonmoving party). As noted by one court, suits on promissory notes are particularly suitable for summary judgment disposition. *FDIC v. Cardinal Oil Well Services Co., Inc.*, 837 F.2d 1369, 1371 (5th Cir.1988).

In deciding whether a factual dispute is genuine, this court must determine whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *accord Aponte–Santiago v. Lopez–Rivera*, 957 F.2d 40, 41 (1st Cir. 1992) (citing *Anderson*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A fact is "material" if it might affect the outcome of the suit under the governing substantive law. *Beck v. Somerset Technologies*, 882 F.2d 993 (5th Cir.1989) (citing *Anderson*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

### A. Plaintiffs' Claims

Turning first to the FDIC's motion with respect to plaintiffs' verified complaint, the FDIC makes three arguments. First, the FDIC contends that plaintiffs failed to exhaust the administrative claims process in accordance with 12 U.S.C. § 1821(d)(13)(D) thereby divesting this court of jurisdiction to hear their claims and requiring dismissal of the verified complaint. Second, the FDIC asserts that plaintiffs' claims are barred under the well known *D'Oench, Duhme* doctrine. Third, the FDIC argues that plaintiffs' claims are barred under 12 U.S.C. § 1823(e). This provision requires that any agreement tending to diminish the FDIC's

---

**12.** The allegations regarding the 1985 Isuzu constitute one of the "facts" used by plaintiffs to support counts I and II of their verified complaint for deceit and violation of chapter 93A.

interest in its acquired assets must satisfy four categorical requirements. (Docket Entry # 16). This court addresses the arguments *seriatim.*[13]

## I. *Administrative Claims Process*

■ Without distinguishing the different factual basis upon which plaintiffs' claims for deceit and chapter 93A rest, the FDIC takes the broad position that plaintiffs' counts for deceit and chapter 93A must be dismissed for lack of subject matter jurisdiction inasmuch as plaintiffs failed to exhaust the administrative claims process. The record is undisputed that the FDIC adequately complied with the notice provisions of 12 U.S.C. § 1821(d)(3) (Docket Entry # 16, Ex. P).[14] Accordingly, in the event plaintiffs' claims fall within the purview or reach of 12 U.S.C. § 1821(d), this court must either dismiss or stay the *claims pending administrative* exhaustion.[15]

FIRREA[16] established a comprehensive administrative procedure for adjudicating claims brought against failed institutions. 12 U.S.C. §§ 1821(d)(5)–(14). "Participation in the administrative claims review process is mandatory for all parties asserting claims against a failed institution, regardless of whether the lawsuit to enforce a claim was initiated prior to the appointment of a receiver." *Performance Auto Sales v. Federal Deposit Insurance Corporation,* 1993 WL 23718 at * 1 (D.Mass. January 15, 1993) (citing *Marquis v. FDIC,* 965 F.2d 1148, 1151 (1st Cir.1992)). The *Marquis* court held that "where a claimant has been properly notified of the appointment of a federal insurer as

receiver, 12 U.S.C. § 1821(d)(3)(B)–(C), and has nonetheless failed to initiate an administrative claim within the filing period, 12 U.S.C. § 1821(d)(3)(B)(i), the claimant necessarily forfeits any right to pursue a claim against the failed institution's assets in any court." *Marquis v. FDIC,* 965 F.2d at 1152. Provided the FDIC properly complies with the statutory notice provisions, section 1821(d)(5)(C) dictates that all claims filed after the bar date, in this instance July 15, 1992 (Docket Entry # 16, Ex. P), "shall be disallowed and such disallowance shall be final." 12 U.S.C. § 1821(d)(5)(C)(i).

As further delineated in *Marquis,* however, a court is not not required to dismiss prior pending actions until the administrative claims review process is satisfied. *See Marquis,* 965 F.2d at 1155 ("FIRREA [does] not strip the federal courts of subject matter jurisdiction over civil actions pending against a failed financial institution at the time the FDIC takes over as the institution's receiver"). FIRREA "permits federal courts to retain subject matter jurisdiction in circumstances where a bank's failure and the FDIC's appointment as receiver postdates the institution of the suit against the bank." *Marquis,* 965 F.2d at 1154; *accord Coston v. Gold Coast Graphics, Inc.,* 782 F.Supp. 1532, 1535 (S.D.Fla.1992) (jurisdiction retained over lawsuit filed prior to FDIC appointment pending exhaustion of administrative claims).

In the case at bar, plaintiffs filed their lawsuit prior to the FDIC's appointment as receiver. "[T]he usual course in a prereceivership action is to stay proceedings pending exhaustion of the [administrative claims re-

---

**13.** In light of the fact that section 1823(e) is a statutory codification of *D'Oench* this court will discuss these two arguments simultaneously in section II *infra.* It is important to remember, however, that section 1823(e) is not necessarily coextensive with federal common law under *D'Oench. See Bateman v. FDIC,* 970 F.2d 924, 927 (1st Cir.1992).

**14.** The FDIC claims officer avers that immediately after the FDIC's appointment as receiver, the FDIC published notices in certain newspapers regarding when and where to file claims. In addition, the FDIC mailed notices to all known claimants including Development, Equipment, Concrete and Kenneth and Thomas Racicot, as trustees of Pavilion Realty Trust. The summary

judgment record not only contains this affidavit, but the record also includes the actual newspaper notices and the proof of claim notices mailed to the above parties. (Docket Entry # 16, Ex. P).

**15.** As discussed in greater detail *infra,* the decision to dismiss or stay depends upon whether the claim existed prior to the Bank's insolvency and the FDIC's appointment and, if so, whether staying the case is nevertheless moot in light of the unavailability of the administrative claims process.

**16.** FIRREA is an acronym for the Financial Institutions Reform, Recovery and Enforcement Act, 12 U.S.C. §§ 1821(d)(5)–(14).

view process]." *Espinosa v. DeVasto,* 818 F.Supp. 438, 441 (D.Mass.1993) (citing *Marquis* as well as additional authority).

Rather than request a stay, however, the FDIC seeks dismissal for lack of subject matter jurisdiction. To the extent plaintiffs' "claims" fall within the reach of section 12 U.S.C. § 1821(d)(3), this court agrees that dismissal as opposed to a stay is the proper result in this case. As further recognized by Chief Judge Joseph L. Tauro in *Espinosa,* "issuance of a stay presupposes that a claimant still has time in which to initiate the [administrative claims review process]." *Id.* at 441. Inasmuch as the *Espinosa* plaintiffs had not filed a claim and the deadline had passed, "[u]nless plaintiffs can demonstrate a valid excuse for their delay, the court will have no choice but to dismiss their claims against the FDIC." *Id.* at 441 (citing *Marquis* and *Althouse v. Resolution Trust Corporation,* 969 F.2d 1544 (3rd Cir.1992)). The deadline in the case at bar expired on July 15, 1992. Plaintiffs fail to offer any excuse for their failure to file a claim despite proper notification. Consequently, this court lacks subject matter jurisdiction over any claims of plaintiffs which fall within the reach of 12 U.S.C. § 1821(d)(3).

■ A recent First Circuit opinion delineates the reach of section 1821(d)(3) and the distinction between FIRREA's statutory section governing creditor actions against the assets of a failed bank which require administrative exhaustion and dismissal for lack of subject matter jurisdiction (21 U.S.C. § 1821(d)) and FIRREA's statutory section governing contract repudiation claims which are not jurisdictionally based (12 U.S.C. § 1821(e)). *Henno v. Federal Deposit Insurance Corporation,* 996 F.2d 429 (1st Cir. 1993). As stated in *Henno:*

> Subsection 1821(d) governs only claims against assets of the failed financial institution. Subsection 1821(e) authorizes claims

for compensatory relief for direct loss occasioned by FDIC's repudiation of a prereceivership contract entered into by the failed financial institution.

*Id.* at 433.

Henno's compensatory claims consisted of an alleged "agreement among Henno, Balco and the Bank, whereby Balco would deed two disputed lots to Henno—which it did—and the Bank would release its first mortgage liens on this lot, and apply $125,000 from the monies in escrow toward roadwork in the ... development." *Id.* at 435. Henno supposedly complied with his obligations but, upon request, the FDIC failed to release the monies in escrow. *Id.* at 435. Henno's compensatory contract repudiation claim sounds strikingly similar to plaintiffs' claim that the FDIC promised to discharge a mortgage upon payment of $200,000. To a lesser extent, Henno's contract repudiation claim is also analogous to plaintiffs' claims that: (1) the FDIC misrepresented the terms of the October 1987 loan and falsely claimed Development was a guarantor under one of the loan agreements and (2) the FDIC fraudulently obtained additional collateral for a loan that was not in default, i.e., the FDIC breached one or more of the loan contracts. As such, these "claims" are not subject to dismissal for lack of jurisdiction. Rather, these claims should be analyzed under *D'Oench* and section 1823(e).[17]

■ Plaintiffs' claim that the Bank wrongfully seized the 1985 Isuzu, however, falls within the reach of section 1821(d) inasmuch as it is a claim against an asset (the Isuzu) held by the FDIC and seeks a determination of rights vis-a-vis this asset. "The jurisdictional bar of section 1821(d)(13)(D) reaches all claims seeking payment from the assets of the affected institution, all suits seeking satisfaction from those assets; and all actions for a determination of rights vis-a-vis these

---

17. As recognized in a footnote in *Henno,* the court stated the following in regard to Henno's claim for compensatory relief which the lower court erroneously dismissed for lack of jurisdiction under 1821(d):

> As the claim for compensatory relief was dismissed for lack of jurisdiction, the district court made no findings relating to whether, or

what, Bank records may have been lost. On remand, therefore, appellants may confront a serious problem of proof. *See D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp.,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942); *see also* 12 U.S.C. s 1823(c). Nevertheless, the "writing" requirement is not jurisdictional. *Id.* at 435, n. 12.

assets." *Marquis v. FDIC,* 965 F.2d at 1152. Plaintiffs failed to file an administrative claim despite proper notification. The deadline to file such a claim has passed. Accordingly, this court lacks jurisdiction to consider their allegation that the FDIC wrongfully seized and is wrongfully retaining this asset.[18]

## II. D'Oench and Section 1823(e)

The FDIC also argues that plaintiffs' claim are barred under *D'Oench* as well as under section 1823(e). This court agrees.

The purpose of the *D'Oench* estoppel doctrine is to enable the FDIC to rely on a bank's records at the time it takes over an insolvent bank.[19] As such, the *D'Oench* doctrine applies to "all secret agreements that tend to make the FDIC susceptible to fraudulent arrangements." *Sabbag, Inc. v. FDIC,* 1991 WL 146876 at * 1 (D.Mass. July 26, 1991).

As summarized in *Timberland,* the focus of *D'Oench* is whether an "agreement, at the time it was entered into, would tend to mislead the public authority." *Timberland Design v. First Service Bank for Savings,* 932 F.2d 46, 50 (1st Cir.1991); *accord In re 604 Columbus Avenue Realty Trust,* 968 F.2d 1332, 1345 (1st Cir.1992) (proper focus "under *D'Oench* is whether the agreement, at the time it was entered into, would tend to mislead the public authority"); *see also Desmond v. FDIC,* 798 F.Supp. 829, 833 (D.Mass.1992) (quoting *D'Oench* ). The *D'Oench* doctrine "thus favors the interests of depositors and creditors of a failed bank, who cannot protect themselves from secret agreements, over the interests of borrowers, who can." *Id.* at 48 (quoting *Bell & Murphy & Assoc. v. Interfirst Bank Gateway, N.A.* 894 F.2d 750, 754 (5th Cir.), *cert. denied,* 498 U.S. 895, 111 S.Ct. 244, 112 L.Ed.2d 203 (1990)); *see FDIC v. Caporale,* 931 F.2d 1 (1st Cir.1991) (borrowers in best position to

protect themselves; *D'Oench* prevented borrowers from recovery on notes).

The reach of *D'Oench,* as interpreted by subsequent court decisions, is expansive. The doctrine operates to bar affirmative counterclaims as well as defenses premised on secret side agreements. *Timberland Design, Inc. v. First Service Bank for Savings,* 932 F.2d at 48–49. Actual knowledge on the part of FDIC officials or the intent of the borrower to defraud the FDIC is immaterial. *See Langley v. FDIC,* 484 U.S. 86, 94–95, 108 S.Ct. 396, 402–03, 98 L.Ed.2d 340 (1987) (knowledge of misrepresentation by FDIC irrelevant under § 1823(e)); *Timberland Design, Inc. v. First Service Bank for Savings,* 932 F.2d at 48 ("*D'Oench* doctrine does not require a showing that a party had the intent to defraud"). Essentially, all that is required is that the borrower lent himself to a scheme that was likely to mislead the FDIC by, for example, failing to reduce the oral side agreement to a writing. *Timberland Design, Inc. v. First Service Bank for Savings,* 932 F.2d at 48–49; *Desmond v. FDIC,* 798 F.Supp. 829, 833 (D.Mass.1992).

By failing to reduce the "clear understanding" that the Bank would discharge the mortgage upon payment of $200,000, plaintiffs lent themselves to a scheme likely to mislead the FDIC when it took over the Bank and reviewed the Bank's records. This understanding "would not have been apparent to the FDIC upon review of the bank records." *Hill v. Samuel Cabot, Inc.,* 1993 WL 343673 at * 2 (D.Mass. August 26, 1993) (claims, including one for violation of chapter 93A, barred under *D'Oench* inasmuch as borrower lent himself to scheme likely to mislead regulators). Similarly, plaintiffs' claim that the Bank misrepresented the terms of the October 1987 loan is based on a secret agreement which required the Bank to assume such an obligation.[20] The clear language of the Octo-

---

18. Alternatively, this claim is barred under *D'Oench* and under section 1823(e) for reasons stated in section II *infra.*

19. The *D'Oench* decision, which involved the FDIC in its corporate capacity, also applies when the FDIC sues as receiver. *Timberland Design, Inc. v. First Service Bank for Savings,* 932 F.2d

46, 49 (1st Cir.1991). Similarly, defenses under 12 U.C.S. § 1823(c) are available to the FDIC in both its receiver and corporate capacities. 12 U.S.C. § 1821(d)(9)(A).

20. As noted in *Timberland,* the *D'Oench* doctrine applies to claims sounding in tort as well as in contract so long as the claim arises out of an

ber 1987 loan is to the contrary. The note states the three year expiration date, provides that in the event of default the obligation becomes immediately due at the option of the Bank and pronounces that the maker and guarantor waive presentment, demand and notice in connection with default. (Docket Entry # 16, Ex. E).

To the extent not barred under *D'Oench,* plaintiffs' claims are not contained in the Bank's records as averred by Hunter (Docket Entry # 16, Ex. O). Consequently, plaintiffs' claims fail to satisfy the "in writing" requirement of 12 U.S.C. § 1823(e)(1).

Section 1823 provides that:

No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it under this section . . ., either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the [FDIC] unless such agreement—

(1) is in writing,

(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

(3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

(4) has been, continuously, from the time of its execution, an official record of the depository institution.

18 U.S.C. § 1823(e). Section 1823(e) thereby "enforces the *D'Oench* doctrine by requiring that any 'agreement' that might diminish the value of an asset acquired by the FDIC be formally recorded as part of a bank's official records." *Desmond v. FDIC,* 798 F.Supp. at 834. As stated by the First Circuit, the Supreme Court in *Langley* ruled that section 1823(e) shields the FDIC "from essentially all claims of misrepresentation relating to any asset acquired by it under 12 U.S.C. §§ 1821 and 1823." *McCullough v. FDIC,*

987 F.2d 870, 871–872 (1st Cir.1993) (*Langley* rule applies to misrepresentation claims based on nondisclosure).

Plaintiffs' claims for misrepresentation regarding the October 1987 loan, the identity of the guarantors of Equipment's obligation to the Bank, the promise to discharge the mortgage upon payment of $200,000 and the acquisition of additional collateral for a loan that was not in default are all claims which should and could have been in writing in the Bank's records at the time the Comptroller declared the Bank insolvent. Nor is there any evidence in the record that the minutes of the Bank's board of directors reflect the above claims thereby satisfying subsection 1823(e)(3). *See FDIC v. Manatt,* 922 F.2d 486, 489 (8th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 2889, 115 L.Ed.2d 1054 (1991) (insufficient recording of agreement under the third subsection); *see also FDIC v. Gardner,* 606 F.Supp. 1484, 1486–88 (D.C.Miss.1985).

In sum, under both *D'Oench* and section 1823(e) plaintiffs' claims for deceit and violation of chapter 93A are subject to summary disposition. Facts used to support these claims fail under *D'Oench* and section 1823(e).

### B. *FDIC's Counterclaim*

The FDIC also moves for summary judgment with respect to counts I and II of its counterclaim. The FDIC contends that Thomas and Kenneth Racicot, as trustees of Pavilion Realty Trust, executed the March 18, 1988 promissory note. The FDIC also submits that Racicot Realty Trust, Concrete, Kenneth, Thomas and Russell Racicot, Development, Equipment, Construction and International unconditionally guaranteed the note. The note remains in default, according to the FDIC, and the third party defendants fail to assert any claims or defenses regarding the actions of the Bank and/or the FDIC. (Docket Entry # 15).

Plaintiffs object to summary judgment. They argue, in part, that the Bank fraudu-

alleged secret agreement. *Timberland Design, Inc. v. First Service Bank for Savings,* 932 F.2d

at 50.

lently induced them to execute the March 18, 1988 promissory note by misrepresenting that the October 1987 loan was in default. Plaintiffs further maintain that the Bank never furnished them with an accounting regarding the sale of certain equipment in partial satisfaction of the outstanding balance. (Docket Entry # 17). In support of their opposition, plaintiffs submit their verified complaint.

 The March 1988 note is governed by Massachusetts law. "Under Massachusetts law the 'interpretation of a contract is ordinarily a question of law for the court.'" *Rey v. Lafferty,* 990 F.2d 1379, 1384 (1st Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 94, 126 L.Ed.2d 61 (1993) (quoting *Fairfield 274–278 Clarendon Trust v. Dwek,* 970 F.2d 990, 993 (1st Cir.1992)). "Only if the contract is ambiguous is there a question of fact for the jury." *Fairfield 274–278 Clarendon Trust v. Dwek,* 970 F.2d at 993. Although under Massachusetts law, parol evidence is inadmissible "to contradict the clear terms of an agreement, or to create ambiguity where none otherwise exists," *ITT Corporation v. LTX Corporation,* 926 F.2d 1258, 1261 (1st Cir.1991), the parol evidence rule "does not apply when the complaining party alleges fraud in the inducement." *McEvoy Travel Bureau, Inc. v. Norton Company,* 408 Mass. 704, 563 N.E.2d 188, 193 & n. 5 (1990). Language within a contract "is usually considered ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable difference[s] of opinion." *Rey v. Lafferty,* 990 F.2d at 1384; *accord Fairfield 274–278 Clarendon Trust v. Dwek,* 970 F.2d at 993 (agreements generally presumed to express the intent of the parties).

 More importantly, where a contract is unambiguous, it will be enforced according to its terms. *Fairfield 274–278 Clar-*

*endon Trust v. Dwek,* 970 F.2d at 993; *Edmonds v. United States,* 642 F.2d 877, 881 (1st Cir.1981). In the case at bar, the terms of the March 1988 note are straightforward and unambiguous. The note is only three pages in length and does not contain any fine print. The primary obligation of the maker is stated in the first paragraph as follows: the maker(s) of the note, Thomas and Kenneth Racicot, as trustees of Pavilion Realty Trust, "promises to pay to [the Bank] ... the sum of Three hundred thousand and 00/100 ($300,000) Dollars with interest at the rate hereinafter provided until paid in full." (Docket Entry # 16, Ex. H).

The March 1988 note also provides that the maker waives "presentment, demand, notice, protest, and all other demands on notices in connection with the ... performance, default, or enforcement of this note." (Docket Entry # 16, Ex. H). Finally, the note reads that it shall "be in default if and when the Trustees of Pavilion Realty Trust or *any guarantor* of this Note shall default on *any obligation or loan* to the [Bank]." (Docket Entry # 16, Ex. H, Emphasis Added).

Each of the following individuals or entities signed virtually identical four page documents entitled "Guaranty" with respect to the March 1988 note: Thomas and Russell Racicot,[21] Concrete, Racicot Realty Trust, Construction, Development, International, Equipment and Celtic Development Company, Inc. With the exception of Celtic Realty, Inc.,[22] the FDIC seeks summary judgment on the counterclaim against all of the above individuals and entities. (Docket Entry # 15, p. 2).

The guaranties state that "[f]or valuable consideration ... of [the Bank] having made, or now or in the future making, advances or otherwise giving credit to PAVILION REALTY TRUST," the maker "unconditionally" guarantees "full and prompt payment at ma-

---

21. Kenneth Racicot also signed a guaranty although the FDIC is not seeking summary judgment with respect to Kenneth Racicot. Julie Racicot also signed a guaranty.

22. The FDIC fails to describe the exact relationship of Celtic Realty, Inc. and the obligations it undertook with respect to the March 1988 note. Absent such a description within 20 days of the date of this Report and Recommendation, sum-

turity of all present and future obligations [23] of [Pavilion Realty Trust] to [the Bank]." (Docket Entry # 16, Ex. I). The guaranties further provide that upon default by Pavilion, the joint and several liability of the guarantor "shall be effective immediately, without demand, presentment, protest or notice of any kind, all of which are hereby waived." (Docket Entry # 16, Ex. I).

As averred by Gallo, the March 1988 note is in default and, as of May 15, 1990, there is due and owing $351,169.07 on the March 1988 note, plus continuing interest thereon exclusive of costs and attorneys' fees. (Docket Entry # 16, Ex. K). As of July 11, 1990, Hunter attests that, after taking various steps and collecting a portion of the amount owed, there is due and owing $102,104.57 on the March 1988 note. As of July 1, 1993, Hunter avers that $115,910.64 is due and owing on the March 1988 note with interest accruing thereafter at a daily rate of $12.71. (Docket Entry # 16, Ex. O).

On summary judgment, the third party defendants/plaintiffs must do more than simply cast some doubt on the FDIC's position. In contrast to the above documentation, plaintiffs put forth their verified complaint. Therein, plaintiffs make a legal allegation that the Bank fraudulently induced them to execute the "new promissory note," i.e., the March 1988 note. The basis for plaintiffs' fraudulent inducement defense is that plaintiffs did not know and were not told that the October 1987 note "was a three year promissory note and was not past-due." (Docket Entry # 17, Ex. A). Not only is this defense barred under *D'Oench, see Fleet Bank of Maine v. Wilson,* 780 F.Supp. 841, 845–846 (D.Me.1991) (borrower barred from asserting affirmative defense of fraudulent inducement

under *D'Oench* ),[24] but the alleged misrepresentation flatly contradicts the express terms of the October 1987 note which prominently sets forth the three year due date and further states that Pavilion waives notices in connection with default. Both Thomas and Kenneth Racicot initialed this page of the October 1987 note and the provisions relating to payment are, in part, written in longhand and again initialed by Thomas and Kenneth Racicot. (Docket Entry # 16, Ex. E).

To prevail on a fraudulent misrepresentation defense,[25] plaintiffs must show that the Bank "made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to its damage." *Danca v. Taunton Savings Bank,* 385 Mass. 1, 429 N.E.2d 1129, 1133 (Mass.1982); *Kennedy v. Josephthal & Co., Inc.,* 814 F.2d 798 (1st Cir.1987) (quoting *Danca* and also requiring showing of justifiable reliance in securities action); *see also Elias Brothers Restaurants, Inc. v. Acorn Enterprises, Inc.,* 831 F.Supp. 920, 921–923 (D.Mass.1993) (stating above elements; motion to amend to add affirmative defense based on fraudulent inducement denied inasmuch as plaintiff failed to establish claim for fraudulent misrepresentation as matter of law in light of unreasonable reliance). Additionally, plaintiffs must show that their reliance on the alleged misrepresentation was reasonable. *Elias Brothers Restaurants, Inc. v. Acorn Enterprises, Inc.,* 831 F.Supp. at 922 (D.Mass.1993) (citing *Saxon Theatre Corporation of Boston v. Sage,* 347 Mass. 662, 200 N.E.2d 241, 244–245 (1964)).

While it is true that a party may not contract out of fraud, it is also clear that the

---

mary judgment as to Celtic Realty, Inc. is improper.

23. The term "obligations" is broadly defined in the guaranties to encompass "loans, indebtedness, notes, liabilities ... and amounts, liquidated or unliquidated, owing by [Pavilion Realty Trust] to [the Bank] at any time." (Docket Entry # 16, Ex. I).

24. This court will nevertheless address the merits of the defense as an additional basis to allow the FDIC's motion for summary judgment.

25. Rather than make this defense in their answer to the counterclaim, plaintiffs generally raise the defense in their verified complaint. *See VMS Realty Investment, Ltd. v. Keezer,* 34 Mass.App.Ct. 119, 606 N.E.2d 1352, 1352 (1993). In light of plaintiffs' failure to allege this defense, let alone plead it with particularity, the FDIC's failure to object does not constitute a waiver.

parties to the instant dispute are sophisticated businessmen who had dealt with each other on a continuing basis for a substantial period of time. The third party defendants signed guaranties for the October 1987 note which refer to Pavilion's obligations to the Bank and state that "upon default ... the liability of the undersigned shall be effective immediately." (Docket Entry # 16, Ex. G). The October 1987 note clearly sets forth the three year due date. (Docket Entry # 16, Ex. E).

Plaintiffs nevertheless make an abbreviated statement in their verified complaint that they did not know about the three year due date or that the loan was past due. Consequently, they reason that the Bank fraudulently induced them to enter into the March 1988 note and, presumably, the related guaranties. This court finds such reliance unreasonable as a matter of law. *See, e.g., Elias Brothers Restaurants, Inc. v. Acorn Enterprises, Inc.*, 831 F.Supp. at 922 (D.Mass. 1993) (detailed discussion of applicable law and finding reliance unreasonable as a matter of law).

Plaintiffs submit no evidence to contradict the FDIC's documents establishing that the March 1988 note was in default. Although the verified complaint states that the October 1987 note for $300,000 was "kept current," the verified complaint fails to reflect any similar statement regarding the March 1988 note. Similarly, plaintiffs fail to submit evidence disputing the amount of the default. In light of the above uncontroverted facts regarding default on the March 1988 note and the amount due and owing, summary judgment on counts I and II of the FDIC's counterclaim is appropriate.

## CONCLUSION

In accordance with the foregoing discussion, this court **RECOMMENDS**[26] that the FDIC's motion for summary judgment

(Docket Entry # 15) be **ALLOWED** with respect to plaintiffs' complaint and with respect to counts I and II of the FDIC's counterclaim.[27] This court further suggests but does not order that the FDIC submit an affidavit detailing the total amount due on the March 1988 note, including costs, as of the date of this Report and Recommendation.

---

26. Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten days of receipt of the Report and Recommendation to which objection is made and the basis for such objection. Any party may respond to another party's objections within ten days after service of the objections. Failure to file objections within the specified time waives the right to appeal the district court's order. *United States v. Escoboza Vega*, 678 F.2d 376, 378–79 (1st Cir.1982); *United States v. Valencia–Copete*, 792 F.2d 4, 6 (1st Cir.1986).

27. See footnote number 22.